IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEXTPOINT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  08-CV-4593 |
| | ) | |
| v. | ) | Honorable Blanche Manning |
| | ) | |
| NEXTPOINT NETWORKS, INC., | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Eric N. Macey
Richard L. Miller II
John F. Shonkwiler
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900
Doc # 233222

Plaintiff Nextpoint, Inc., by its attorneys, Novack and Macey LLP, submits this Memorandum of Law in Support of Its Motion for Preliminary Injunction (the "Motion"), which seeks relief from Defendant Nextpoint Networks, Inc.'s infringement of Plaintiff's "Nextpoint" trademarks and other tortious conduct in connection therewith.

## I.

## INTRODUCTION

Plaintiff is in need of preliminary injunctive relief from the Court. Plaintiff has been using the name "Nextpoint" for over two years, and its trademark applications for the standard character and design versions of the "Nextpoint" mark have been allowed by the United States Patent and Trademark Office ("USPTO"). Defendant Nextpoint Networks, Inc. was formed in January 2008 and, without permission from Plaintiff, began doing business as "Nextpoint" and using a "Nextpoint" design mark that is virtually identical to Plaintiff's. Defendant's wrongful actions are causing confusion among customers and damaging Plaintiff's goodwill and reputation in violation of the Lanham Act, and Illinois statutory and common law. Plaintiff requires prompt injunctive relief to prevent it from being irreparably harmed between now and the time this litigation is ultimately resolved.

## II.

## STATEMENT OF FACTS

**A.    Nextpoint**

In 2001, Rakesh Madhava ("Madhava") founded Madhava Media, Inc. to provide litigation support services to lawyers and their clients. (Madhava Aff. ¶2.)[1] The company started with one

---

[1]        The Affidavit of Rakesh Madhava is attached hereto as Exhibit A. It is cited herein as "(Madhava Aff. ¶__.)."

employee and one client. By 2006, the company had grown to at least 20 employees with offices in three States. (Id. ¶3.) In January 2006, Madhava Media, Inc. changed its name to "Nextpoint, Inc." Madhava is the CEO of Nextpoint, Inc. (Id. ¶4.)

Plaintiff develops and deploys proprietary software that allows corporations and law firms to manage electronic evidence, including vast amounts of documents, depositions, videos, transcripts and demonstrative exhibits. (Id. ¶6.) Plaintiff loads its clients' litigation discovery materials and other information into databases and provides access to the databases via Internet and proprietary software that enables clients to search, organize and manage the information. (Id.) Plaintiff provides these services in all phases of litigation, including on site and courtroom service. (Id.)

Plaintiff's clients come from all over the United States. (Id. ¶7.) Indeed, any law firm is a potential customer. (Id.) Likewise, corporations that are involved or may become involved in litigation are potential clients. (Id. ¶8.) Plaintiff's past clients include ExxonMobil Corporation, Verizon Wireless, McDermott Will & Emery, and Winston & Strawn. (Id. ¶9.) Plaintiff has assisted clients in such locations as Chicago, Illinois; Denver, Colorado; San Diego, California; San Jose, California; San Francisco, California; Seattle, Washington; Boston, Massachusetts; Islip, New York; Wilmington, Delaware; Alexandria, Virginia; and Palm Beach, Florida. (Id. ¶10.)

**B.      The Nextpoint Marks**

Since January 2006, Plaintiff has done business exclusively under the "Nextpoint" trade name and has used the standard character trademark "Nextpoint" (the "Standard Character Mark") to identify its products and services and distinguish them from competitors' products and services. (Id. ¶11.) At that same time, Plaintiff also began using a stylized version of its name, with the three ellipses over the word "nextPoint" (the "Design Mark"), to identify its products and services and

2

distinguish Plaintiff from its competitors. (Id. ¶12.) The Design Mark was modified slightly in December 2007 to reduce the size of the ellipses and change the "P" to a lower case character. By design, the modification preserved the look and feel of the original version of the Design Mark and, thus, preserved the goodwill associated therewith. (Id. ¶13.)[2]

Since January 2006, Plaintiff has used, and continues to use, the Standard Character Mark and Design Mark (collectively, the "Nextpoint Marks") in the following materials and media, among others:

- Paid placements through Internet search engines;
- Internet "blog" postings;
- Plaintiff's website, www.nextpoint.com;
- Electronic mail "blasts" to business contacts;
- Employee business cards;
- Business letterhead;
- Signage at its offices in Chicago, Los Angeles and Madison, Wisconsin;
- Hard copy advertising materials such as brochures;
- Promotional materials to business contacts;
- Invoices to existing clients;
- Electronic mail return address blocks; and
- Employee carrying cases/bags which are used for client visits and courtroom work.

(Id. ¶15.) Plaintiff has invested hundreds of hours and tens of thousands of dollars to promote the Nextpoint Marks and the services and products associated therewith. (Id. ¶16.) Plaintiff has had substantial success. In addition, Plaintiff has received recognition from national media. For example, Plaintiff was recognized on the Chicago Tribune website in March 2006 for its work on the trial of Gov. George Ryan -- the former Governor of Illinois -- and in favorable write-ups in a July 17, 2007, Law.com article and the June 2006 issue of Lawyers USA. (Id. ¶17.)

---

[2]      The Design Mark, in both its original and modified forms, is shown on Exhibit 1 to the Madhava Affidavit.

Plaintiff has applied to the USPTO for registration of the Standard Character Mark and Design Mark on the principal register. (Id. ¶18.) On July 3, 2007, the USPTO issued Notices of Allowance for both applications. (Id. ¶19.) The only additional step Plaintiff must complete to obtain certificates of registration for the marks on the principal register is to submit proof of actual use. (Id. ¶20.) Plaintiff is in the process of doing this. (Id.)

## C.    **Defendant's Infringing Marks**

On or about January 22, 2008, Defendant Nextpoint Networks, Inc. formed and began doing business under the name "Nextpoint." (Id. ¶21.) At that time, Defendant also began using the website "www.nextpointnetworks.com," the name for which is quite similar to Plaintiff's website which is located at "www.nextpoint.com." (Id. ¶22.) At approximately that same time, Defendant began using a "Nextpoint" design mark that is remarkably similar to Plaintiff's Design Mark.[3] (Id. ¶23.) The Infringing Marks appear on Defendant's web page. (Id. ¶21.)

Defendant never sought or obtained Plaintiff's permission to use either of the Infringing Marks. (Id. ¶26.) This is despite Plaintiff's pre-existing presence in the marketplace and Plaintiff's pending applications for registration of the Nextpoint Marks. (Id. ¶27.) Indeed, the most cursory search of the USPTO records, which are available to the public through the USPTO's website, would have identified Plaintiff's pending applications. (Id. ¶28.) Likewise, any basic Internet search would have identified Plaintiff's business and its Nextpoint Marks. (Id. ¶29.)

Defendant's website contains only a vague description of the goods and services Defendant provides, indicating Defendant is in the business of providing:

---

[3]    A copy of Defendant's purported mark is depicted in Exhibit 2 to the Madhava Affidavit, which is Exhibit A hereto. Defendant's "Nextpoint" trade name and stylized "Nextpoint" mark are collectively referred to herein as the "Infringing Marks."

> access and interconnect solutions for applications that are fixed,
> mobile or converged. In addition to delivery of secure fixed and
> mobile voice, data and multimedia sessions over a flexible and
> scalable platform, Nextpoint's solution suites enable operators to
> evolve their networks to encompass services that deliver greater
> ARPU to consumers and enterprises.

(Id. ¶30.) This description is confusingly similar to Plaintiff's business: the developing and

deploying of software to assist its clients in managing electronic evidence. (Id. ¶6.) By chance,

Plaintiff has already discovered one individual who, due to the content of Defendant's website, was

confused as to whether Defendant's website was actually the website for Plaintiff. (See Fleischman

Aff. ¶¶15-19.)[4]

Defendant has also chosen to use "Nextpoint" as the first metatag for its website, so that

when Internet users input "Nextpoint" into a search engine, such as Google, they are more likely to

be directed to Defendant's website. (Madhava Aff. ¶31.)[5] This undermines a critical component of

Plaintiff's marketing, which is to maximize "hits" to its website through Internet search engines by,

among other things, using its name repeatedly on its website. (Id. ¶32.) Defendant also recently has

attempted to register "Nextpoint" as a standard character mark with the USPTO -- although

Defendant's application was submitted nearly two years after Plaintiff's. (Id. ¶33.)

---

[4]      The affidavit of Elyse Fleischman is attached hereto as Exhibit B. It is cited herein
as "(Fleischman Aff. ¶___.)."

[5]      "Metatags" are words and phrases that describe a website or its contents and that
trigger "hits" when matching terms are entered into Internet search engines. An informative
description of metatags can be found in Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 810
n.1 (7th Cir. 2002).

D.    **Evidence Of Confusion**

Plaintiff has received numerous indications that individuals are confused as to the source of Defendant's products or services or whether Defendant and Plaintiff are connected, affiliated or one-and-the-same. (See generally Lehr Aff.; Fleischman Aff.)[6] Plaintiff's receptionists have received telephone and email inquiries from individuals who were attempting to reach Defendant. Plaintiff also has received marketing correspondence that was intended for Defendant. (Fleischman Aff. ¶14.) Plaintiff even interviewed a job applicant who had attempted to locate Plaintiff's website and was unable to determine -- as between nextpoint.com and nextpointnetworks.com -- which website was Plaintiff's. (Id. ¶¶15-19.)

E.    **Defendant Has Refused Plaintiff's Demands To Cease And Desist**

On January 9, 2008, Plaintiff's attorneys sent Defendant a letter advising Defendant that its use of the Infringing Marks was unauthorized and unlawful, and demanding that Defendant cease all use of the Infringing Marks in commerce. (Madhava Aff. ¶¶35-36 & Ex. 3 thereto.) Defendant has refused Plaintiff's demand, and has continued its unauthorized and unlawful use of the Infringing Marks. (Id. ¶37.)

## III.

## ARGUMENT

Plaintiff is seeking a preliminary injunction based upon its claims for trademark infringement, unfair competition and deceptive trade practices.[7] To obtain a preliminary injunction,

---

[6]    The affidavit of Allison Lehr is attached hereto as Exhibit C. It is cited herein as "(Lehr Aff. ¶___.)."

[7]    Plaintiff's claims for infringement, unfair competition and deceptive trade practices
(continued...)

Plaintiff must demonstrate:  (a) a reasonable likelihood of success on the merits; (b) lack of an adequate remedy at law; and (c) that it will suffer irreparable harm if the injunction is not granted. Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 461 (7th Cir. 2000).  If these three conditions have been met, then the Court must consider the irreparable harm Defendant would suffer if preliminary relief is granted, balancing such harm against the irreparable harm Plaintiff would suffer if the relief is denied.  Id.  Next, the Court should weigh all of these factors on a "sliding scale," allowing for the fact that the more likely it is that Plaintiff will succeed on the merits, the less the balance of harms need favor Plaintiff.  Id.  Finally, the Court should consider the public interest in denying or granting the injunction.  Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001).

## A.    **Plaintiff Is Reasonably Likely To Succeed On The Merits**

To demonstrate a reasonable likelihood of success on the merits, Plaintiff only must show that its chance of prevailing is "better than negligible." Int'l Kennel Club of Chicago v. Mighty Star, Inc., 846 F.2d 1079, 1084 (7th Cir. 1988); Nano-Proprietary, Inc. v. Keesmann, No. 06-C-2689, 2007 WL 433100, at *4 (N.D. Ill. Jan. 30, 2007).  Plaintiff's claims for trademark infringement, unfair competition and deceptive trade practices share the same two essential elements.  In order for Plaintiff to prevail on these claims, Plaintiff must establish:  (1) that it has a protectable trademark; and (2) a likelihood of confusion as to the origin of Defendant's goods and services.  AT&T Corp. v. Synet, Inc., No. 96-C-0110, 1997 WL 89228, at *4 (N.D. Ill. Feb. 11, 1997).

---

[7]    (...continued)
are Counts I (unfair competition, Lanham Act), V (Illinois Deceptive Trade Practices Act), VI (Illinois Consumer Fraud and Deceptive Business Practices Act), and VII (common law infringement and unfair competition) of its Complaint.

1.    **The Nextpoint Marks Are Protectable**

A mark is protectable if it is inherently distinctive.  Pure Imagination, Inc. v. Pure Imagination Studios, Inc., No. 03-C-6070, 2004 WL 2967446, at*4 (N.D. Ill. Nov. 15, 2004).  Marks are classified into the following five categories of distinctiveness, ranked from least to most distinctive: (a) generic; (b) descriptive; (c) suggestive; (d) arbitrary; and (e) fanciful.  Id.  Marks that are suggestive, arbitrary or fanciful are deemed inherently distinctive and, thus, automatically entitled to trademark protection.  Id.  Conversely, marks that are merely descriptive or generic are not inherently distinctive.  Id.  A descriptive mark describes the ingredients, qualities or characteristics of the good or service.  Avent Am., Inc. v. Playtex Prods., Inc., 68 F. Supp. 2d 920, 928-29 (N.D. Ill. 1999).  Plaintiff's Nextpoint Marks are obviously not descriptive or generic and are, at the very least, suggestive.

A suggestive term "requires the observer or listener to use imagination and perception" to determine the nature of the party's goods or services.  Id.  Here, considerable imagination and perception is required to determine the nature of Plaintiff's business, because the Nextpoint Marks, alone, in no way describe or reveal the products or services with which they are associated.  See, e.g., Pure Imagination, 2004 WL 2967446, at*4 (trade name "Pure Imagination" was suggestive, not descriptive, of graphic design and marketing firm).  Indeed, using some imagination, one might surmise "nextpoint" could describe a product for mapping or navigation, but never a litigation support business like Plaintiff's.  Accordingly, the Nextpoint Marks are inherently distinctive, and automatically protectable.

8

2.    **Plaintiff Can Demonstrate A Likelihood Of Confusion**

Courts look to a number of potentially relevant factors to assess likelihood of confusion. The first is the degree of similarity between the parties' marks. Eli Lilly, 233 F.3d at 461. This factor weighs heavily in favor of Plaintiff. Defendant is using Plaintiff's exact name, "Nextpoint," on its website and in promotional materials. Further, it is using a "Nextpoint" logo that is virtually indistinguishable from Plaintiff's Design Mark. (See Madhava Aff., Exs. 1 (Design Mark & revised Design Mark) & 2 (Defendant's mark).) Thus, Defendant's use of the Infringing Marks is inherently confusing. Moreover, any minor stylistic differences are irrelevant given that the public does not encounter the two marks together. Ty, Inc., 237 F.3d at 898. Given the nationwide scope of Plaintiff's business, the absence of any meaningful distinction between the Nextpoint Marks and the Infringing Marks should be sufficient alone to show a likelihood of success on the merits.

If there is any room for doubt concerning Plaintiff's likelihood of success based on a comparison of the parties' marks, any such doubt is put to rest by Defendant's use of "nextpoint" as a metatag for its website. This is because "'[u]sing another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store.'" Eli Lilly, 233 F.3d at 465 (quoting Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1064 (9th Cir.1999).) Here, Defendant is using Plaintiff's trade name and Standard Character Mark as its first metatag term. It only stands to reason that potential clients of the Plaintiff are being misdirected to Defendant's website by the results of their Internet searches. In fact, there is evidence that such confusion has already occurred. (See generally, Lehr Aff.; Fleischman Aff.(describing interactions with confused individuals).)

The similarity between the parties' products or services is also relevant. Eli Lilly, 233 F.3d at 461. For likelihood of confusion to exist, parties need not be in direct competition, and their goods and services need not be identical. TV Land, L.P. v. Viacom Int'l, Inc., 908 F. Supp. 543, 551 (N.D. Ill. 1995). "[A] trade-mark protects the owner against not only its use upon the articles to which he has applied it but also upon such other articles as might naturally or reasonably be supposed to come from him." Id. The relevant inquiry is not whether the parties are competitors, but whether the parties provide services "so related that the public could reasonably think that the same party offers the services." Pure Imagination, 2004 WL 2967446, at *6.

It is reasonable to infer that the public could think, upon visiting Defendant's website, that Defendant's products and services originate from the same source as the Internet- and software-based litigation support services that Plaintiff offers. According to its website, Defendant:

> provides access and interconnect solutions for applications that are fixed, mobile or converged. In addition to delivering secure fixed and mobile voice, data and multimedia sessions over a flexible and scalable platform, Nextpoint's suites enable operators to evolve their networks to encompass services that deliver greater ARPU to consumers and enterprises.[8]

See Eli Lilly & Co., 233 F.3d at 464 (confusion was likely even though the parties' products were not confusingly similar, because consumers could still mistakenly perceive an affiliation or relationship between the parties); CAE, Inc. v. Clean Air Eng'g, Inc., No. 97-C-3264, 2000 WL 28274, at *16 (N.D. Ill. Jan. 10, 2000) (likelihood of confusion may exist despite "[t]he fact that the products at issue may be 'very different'"). Moreover, in this case, such apparent confusion actually

---

[8]     See http/www.nextpointnetworks.com/go.php?id=7.

10

is occurring (see generally Lehr Aff.; Fleischman Aff.), and that evidence is entitled to substantial weight. Helene Curtis Indus., Inc. v. Church & Dwight Co., 560 F.2d 1325, 1330 (7th Cir. 1977).

In evaluating likelihood of confusion, courts also look to the "area and manner of concurrent use," to determine whether "there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." Pure Imagination, 2004 WL 2967446, at *6. This factor weighs in Plaintiff's favor, because both parties depend on the Internet to promote their businesses, and perform their services. See id.

Another relevant factor is the "strength" of the Nextpoint Marks. This factor relates to the distinctiveness of the marks, "meaning [their] propensity to identify the products or services sold as emanating from a particular source." Id., at *8. As explained above, the Nextpoint Marks are at least "suggestive" and, thus, inherently distinctive. Moreover, "[a] mark's strength is of little importance when the marks are essentially identical," as they clearly are here. Id. Thus, this factor weighs marginally in Plaintiff's favor.

Finally, the Court can reasonably infer that Defendant intended to create this confusion. Before Defendant's business had ever formed, Plaintiff had already used the Nextpoint Marks in commerce to promote its services and had taken steps to register the Nextpoint Marks with the USPTO. Simple internet searches for "Nextpoint" would have disclosed to Defendant that Plaintiff had already adopted its trade name and trademark. Had Defendant not wanted to create confusion, it could readily have chosen another name to avoid creating this conflict. Moreover, Defendant's use of "nextpoint" as a metatag is "significant evidence of intent to confuse and mislead." Eli Lilly, 233 F.3d at 465. Thus, Defendant's intent also weighs in favor of granting Plaintiff preliminary injunctive relief.

11

In sum, Plaintiff has, at the very least, shown it has a "better than negligible" chance of prevailing on the merits -- which entitles Plaintiff to the preliminary injunctive relief it seeks.[9]

**B.    Plaintiff Will Suffer Irreparable Harm And It Has No Adequate Remedy At Law**

The second and third elements of the preliminary injunction analysis are also met as to Plaintiff's claims. Irreparable harm exists given the damaging and yet incalculable harm Defendant's conduct is causing to Plaintiff through its infringing conduct.   This is because it is probably impossible for Plaintiff to establish the actual number of potential customers who conducted research regarding Plaintiff and became confused by Defendant's website and, as a result, never contacted Plaintiff. Similarly, there are surely entities that accidentally contacted Defendant, when looking to hire Plaintiff, and became fed-up due to reaching the wrong entity, and then, as a result, hired one of Plaintiff's competitors. Helene Curtis Indus., Inc. v. Church & Dwight Co., 560 F.2d 1325, 1333 (7th Cir. 1977) ("[C]onfusion may cause purchasers to refrain from buying either product and to turn to those of competitors.").    This is why irreparable harm is presumed in cases of trademark infringement.   See Eli Lilly, 233 F.3d at 469.   Likewise, there is no way to measure Plaintiff's remedy at law because damages occasioned by trademark are by their very nature irreparable. Ty, Inc., 237 F.3d at 902.

The Seventh Circuit's analysis of the irreparable harm element in Helene Curtis Indus., Inc. v. Church & Dwight, Co., 560 F.2d 1325 (7th Cir. 1977), is on point. Plaintiff in that case was the proponent of the "Arm & Hammer" mark, and sought a preliminary injunction enjoining defendant's

---

[9]        At the evidentiary hearing on this matter, Plaintiff intends to present additional sworn testimony of witnesses in support of its claims.

use of the words "Arm in Arm" in connection with the marketing of a deodorant. The Seventh

Circuit stated:

> "Where there is, then, such [a] high probability of confusion, injury
> irreparable in the sense that it may not be fully compensable in
> damages almost inevitably follows. While an injured plaintiff would
> be entitled to recover the profits on the infringing items, this is often
> difficult to determine; moreover, a defendant may have failed to earn
> profits because of the poor quality of its product or its own
> inefficiency. Indeed, confusion may cause purchasers to refrain from
> buying either product and to turn to those of other competitors."

Id. at 1332-33 (quoting Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190, 1195 (2nd

Cir. 1971)). Indeed, the damage to the goodwill and prominence of an existing trademark, through

public confusion of it with an infringing mark, is, in itself, an irreparable injury. Id. at 1332.

Accordingly, Plaintiff is being irreparably harmed by Defendant's use of the Infringing Marks and

lacks an adequate remedy at law to address the injury it has sustained, and will continue to sustain,

absent the entry of a preliminary injunction.

**C.    A Balancing Of The Harms Favors Granting The Preliminary Injunction**

A balancing of the hardships also favors Plaintiff. Plaintiff seeks protection of its trademark

rights only until such time as the Court finally rules upon Plaintiff's requested relief. Plaintiff has

been using the Nextpoint Marks for over two-and-a-half years. In contrast, Defendant has only been

in existence since January 2008. Further, given that Plaintiff sent Defendant a cease and desist letter

on January 9, 2008, Defendant was forewarned that its ongoing use of the name "Nextpoint" could

have negative financial consequences. Having knowingly chosen its course, Defendant should not

now be heard to complain of any negative financial consequences that might be caused by a

preliminary injunction. Ty, Inc., 237 F.3d at 903. Moreover, Plaintiff will be severely harmed if

13

Defendant is allowed to continue to use the Infringing Marks. As the Seventh Circuit has observed, "we have held that 'the owner of a mark is damaged by a later use of a similar mark which place[s] the owner's reputation beyond its control, *though no loss in business is shown*.'" Int'l Kennel Club of Chicago v. Mighty Star, Inc., 846 F.2d 1079, 1091 (7th Cir. 1988) (quoting James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976) (emphasis in original)). Therefore, a balancing of the harms favors preventing Defendant from using the Infringing Marks while this case is being litigated.

**D.    Granting The Preliminary Injunction Will Cause No Harm To The Public**

    The last element of the preliminary injunction analysis is whether the public interest will be harmed by the granting of the injunction. The relevant consideration in making such a determination is the consumer's interest in not being deceived about the products and services they purchased. See Int'l Kennel Club of Chicago, 846 F.2d at 1092, n.8. It has been observed that it is not a trademark which is infringed. Rather, it is the right of the public to be free of confusion. James Burrough Ltd., 540 F.2d at 274. In the instant case, the public will best be served by the prevention of the confusion created by Defendant's belated and unlawful use of Plaintiff's name and Design Mark. Promatek, 300 F.3d at 813-14 ("[B]ecause the injunction prevents consumer confusion in the marketplace, the public interest will be served[.]") Accordingly, a preliminary injunction should be granted.

14

**IV.**

**CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order

granting its Motion for Preliminary Injunction and granting any such other and further relief as the

Court deems appropriate.

Respectfully submitted,

NEXTPOINT, INC.

By:_____/s/ Richard L. Miller II_____
            One of Its Attorneys

15

## CERTIFICATE OF SERVICE

I, Richard L. Miller II, hereby certify that I caused a copy of the foregoing Plaintiff's Memorandum Of Law In Support Of Its Motion For Preliminary Injunction to be served upon the following in the listed manners:

*VIA U.S. MAIL*
Nextpoint Networks, Inc.
c/o The Company Corporation
2711 Centerville Road, Suite 400
Wilmington, DE 19808

*VIA U.S. MAIL AND ELECTRONIC MAIL*
Andrew N. Spivak
Morrison & Foerster LLP
2000 Pennsylvania Avenue NW, Suite 5500
Washington, DC 20006-1831
Fax: (202) 887-0767
Email: aspivak@mofo.com

on this 14th day of August 2008.

_____/s/ Richard L. Miller II_____
Richard L. Miller II

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEXTPOINT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  08-CV-4593 |
| | ) | |
| v. | ) | Honorable Blanche Manning |
| | ) | |
| NEXTPOINT NETWORKS, INC., | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT BY CERTIFICATION OF RAKESH MADHAVA

Under penalties as provided by law, pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

1.      I am 37 years old and I have personal knowledge of the matters attested to herein. I reside in Chicago, Illinois.

2.      In 2001, I founded Madhava Media, Inc. to provide litigation support services to lawyers and their clients.

3.      The company started with one employee and one client.  By 2006, the company had grown to at least 20 employees with offices in three States.

4.      In January 2006, Madhava Media, Inc. changed its name to "Nextpoint, Inc."

5.      I am the CEO of Nextpoint, Inc.

6.      Nextpoint, Inc. develops and deploys proprietary software that allows corporations and law firms to manage electronic evidence, including vast amounts of documents, depositions,

videos, transcripts and demonstrative exhibits. Nextpoint, Inc. loads its clients' litigation discovery materials into databases and provides access to the databases via Internet and proprietary software that enables clients to search, organize and manage the information. Nextpoint, Inc. provides these services in all phases of litigation, including on site and courtroom service.

7.     Nextpoint, Inc.'s clients come from all over the United States. Indeed, any law firm is a potential customer.

8.     Likewise, corporations that are involved or may become involved in litigation are potential clients.

9.     Nextpoint, Inc.'s past clients include ExxonMobil Corporation, Verizon Wireless, McDermott Will & Emery, and Winston & Strawn.

10.     Nextpoint, Inc. has assisted its clients in such locations as Chicago, Illinois; Denver, Colorado; San Diego, California; San Jose, California; San Francisco, California; Seattle, Washington; Boston, Massachusetts; Islip, New York; Wilmington, Delaware; Alexandria, Virginia; and Palm Beach, Florida.

11.     Since January 2006, Nextpoint, Inc. has done business exclusively under the "Nextpoint" trade name and has used the standard character trademark "Nextpoint" (the "Standard Character Mark") to identify its products and services and distinguish them from competitors' products and services.

12.     At that same time, Nextpoint, Inc. also began using a stylized version of its name, with the three ellipses over the word "nextPoint" (the "Design Mark"), to identify its products and services and distinguish Nextpoint, Inc. from its competitors.

2

13. The Design Mark was modified slightly in December 2007 to reduce the size of the ellipses and change the "P" to a lower case character. By design, the modification preserved the look and feel of the original version of the Design Mark and, thus, preserved the goodwill associated therewith.

14. A true and accurate copy of the Design Mark, in both its original and modified forms, is shown on Exhibit 1 to this affidavit.

15. Since January 2006, Nextpoint, Inc. has used, and continues to use, the Standard Character Mark and Design Mark (collectively, the "Nextpoint Marks") in the following materials and media, among others:

- Paid placements through Internet search engines;
- Internet "blog" postings;
- Nextpoint, Inc.'s website, www.nextpoint.com;
- Electronic mail "blasts" to business contacts;
- Employee business cards;
- Business letterhead;
- Signage at its offices in Chicago, Los Angeles and Madison, Wisconsin;
- Hard copy advertising materials such as brochures;
- Promotional materials to business contacts;
- Invoices to existing clients;
- Electronic mail return address blocks; and
- Employee carrying cases/bags which are used for client visits and courtroom work.

16. Nextpoint, Inc. has invested hundreds of hours and tens of thousands of dollars to promote the Nextpoint Marks and the services and products associated therewith.

17. Nextpoint, Inc. has received recognition from national media. For example, Nextpoint, Inc. was recognized on the Chicago Tribune website in March 2006 for its work on the

trial of Governor George Ryan and in a favorable write-ups in a July 17, 2007, Law.com article and the June 2006 issue of Lawyers USA.

18.     Nextpoint, Inc. has applied to the USPTO for registration of the Standard Character Mark and Design Mark on the principal register.

19.     On July 3, 2007, the USPTO issued Notices of Allowance for both applications.

20.     The only additional step Nextpoint, Inc. must complete to obtain certificates of registration for the marks on the principal register is to submit proof of actual use.  Nextpoint, Inc. is in the process of doing this.

21.     On or about January 22, 2008, Nextpoint Networks, Inc. formed and began doing business under the name "Nextpoint."

22.     At that time, Nextpoint Networks, Inc. also began using the website "www.nextpointnetworks.com," the name for which is quite similar to that of Nextpoint, Inc.'s website which is located at "www.nextpoint.com."

23.     At approximately that same time, Nextpoint Networks, Inc. began using a "Nextpoint" design mark that is remarkably similar to Nextpoint, Inc.'s Design Mark.

24.     The "Nextpoint" trade name and the stylized "Nextpoint" mark (collectively, the "Infringing Marks") appear on Nextpoint Network, Inc.'s webpage.

25.     A copy of Nextpoint Networks, Inc.'s purported mark is depicted in Exhibit 2 to this affidavit.

26.     Nextpoint Networks, Inc. never sought or obtained Nextpoint, Inc.'s permission to use the Infringing Marks.

4

27.    This is despite Nextpoint, Inc.'s pre-existing presence in the marketplace and Nextpoint, Inc.'s pending applications for registration of the Nextpoint Marks.

28.    A search of the USPTO records, which are available to the public through the USPTO's website, would have identified Nextpoint, Inc.'s pending applications.

29.    Any basic Internet search would have identified Nextpoint, Inc.'s business and its Nextpoint Marks.

30.    Nextpoint Network, Inc's website contains only a vague description of the goods and services Nextpoint Networks, Inc. provides, indicating Nextpoint Networks, Inc. is in the business of providing "access and interconnect solutions for applications that are fixed, mobile or converged. In addition to delivery of secure fixed and mobile voice, data and multimedia sessions over a flexible and scalable platform, Nextpoint's solution suites enable operators to evolve their networks to encompass services that deliver greater ARPU to consumers and enterprises."

31.    Nextpoint Networks, Inc. has also chosen to use "Nextpoint" as the first metatag for its website, so that when Internet users input "Nextpoint" into a search engine, such as Google, they are more likely to be directed to Nextpoint Networks, Inc.'s website.

32.    This undermines a critical component of Nextpoint, Inc.'s marketing, which is to maximize "hits" to its website through Internet search engines by, among other things, using its name repeatedly on its website.

33.    Nextpoint Networks, Inc. also recently has attempted to register "Nextpoint" as a standard character mark with the USPTO -- although Nextpoint Networks, Inc.'s application was submitted nearly two years after Nextpoint, Inc.'s.

5

34.    Nextpoint, Inc. has received numerous indications that individuals are confused as to the source of Nextpoint Networks, Inc.'s products or services or whether Nextpoint Networks, Inc. and Nextpoint, Inc. are connected, affiliated or one-and-the-same.

35.    On January 9, 2008, Nextpoint, Inc. sent Nextpoint Networks, Inc. a letter advising Nextpoint Networks, Inc. that its use of the Infringing Marks was unauthorized and unlawful, and demanding that Nextpoint Networks, Inc. cease all use of the Infringing Marks in commerce.

36.    A true and accurate copy of Nextpoint, Inc.'s January 9, 2008, letter is attached hereto as Exhibit 3.

37.    Nextpoint Networks, Inc. has refused Nextpoint, Inc.'s demand, and has continued its unauthorized and unlawful use of the Infringing Marks.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Rakesh Madhava

# EXHIBIT 1



# EXHIBIT 2



# EXHIBIT 3

**NEAL ▪ GERBER ▪ EISENBERG**

John A. Cullis
Attorney at Law

Tel 312.269.5998
Fax 312.269.1747
jcullis@ngelaw.com

January 9, 2008

<u>**VIA FEDERAL EXPRESS**</u>

Christopher E. George, Esq.
Morrison & Foerster LLP
2000 Pennsylvania Avenue NW
Suite 5500
Washington, DC  20006-1831

Re:    **Infringement of nextPoint, Inc.'s Trademarks**
        <u>**Our File No. 017699.0703**</u>

Dear Mr. George:

We represent nextPoint, inc. ("nextPoint"), a national provider of litigation support services and software technology. Our client has used its NEXTPOINT mark throughout the nation in connection with its litigation support services and software technology. In fact, nextPoint has been retained to handle several high profile trials throughout the nation, and its products and services have been featured in national publications, such as the Wall Street Journal. nextPoint has also invested significant sums of money in advertising and promoting its products and services in connection with its NEXTPOINT mark, including on its website at www.nextpoint.com. To protect its valuable rights, our client has filed two applications to federally register the mark NEXTPOINT (Ref. 78/814535 and 78/783,188), both of which have been allowed to register on the Principal Register. As a result, nextPoint owns enormous goodwill in its trademarks and <nextpoint.com> domain name, which are among its most valuable assets.

We understand that your client, NexTone Communications, Inc., recently filed a federal trademark application for the mark NEXTPOINT (Ref. S/N 77/310,770) for use in connection with:

computer hardware and software for enabling voice, data, multimedia, and facsimile traffic to be integrated into Internet protocol and for providing related value-added services, namely public network-based PBX services, roaming services and unified services, and

training services in the field of real-time IP communications technologies.

NEAL, GERBER & EISENBERG LLP

Christopher E. George, Esq.
January 9, 2008
Page 2

We also understand that NexTone Communications, Inc. recently announced the merger of NexTone Communications, Inc. with Reef Point Systems, Inc. to form NextPoint Networks, Inc., which is using the term NEXTPOINT both as a trade name and trademark as reflected on its website at www.nextpointnetworks.com in connection with one or more of these goods and services.

The purpose of this letter is to advise you that our client objects to NexTone Communications, Inc.'s and/or NextPoint Networks, Inc.'s use and registration of the term NEXTPOINT and of the domain name <nextpointnetworks.com>. In particular, nextPoint objects to your client's use of the term NEXTPOINT by itself, and also its use of that term stylized in lowercase letters with two-tone coloring together with the series of chevrons over the "i" in the term. Such use in that manner is strikingly similar to nextPoint's mark.

NexTone Communications, Inc. and/or NextPoint Networks, Inc.'s use of the NEXTPOINT mark and the <nextpointnetworks.com> domain name are likely to confuse and deceive consumers into believing, incorrectly, that there is an association with, sponsorship by or relationship between your client and nextPoint. Such likelihood of confusion is only heightened by the use of a strikingly similar logo design in connection with the same or similar goods. NexTone Communications, Inc. and/or NextPoint Networks, Inc.'s use of the NEXTPOINT mark and of the <nextpointnetworks.com> domain name is, therefore, a violation of nextPoint's trademark rights under 15 U.S.C. § 1125(a), as well as state trademark and deceptive trade practices laws.

Consequently, we must insist that NexTone Communications, Inc. and/or NextPoint Networks, Inc. immediately: (1) abandon the application to register NEXTPOINT by filing an express abandonment of U.S. Application No. 77/310,770; (2) take the necessary steps to disable the <nextpointnetworks.com> domain name; (3) discontinue any further usage of the NEXTPOINT mark in their advertising and/or on their websites at www.nextone.com/go.php and www.nextpointnetworks.com; and (4) indicate NexTone Communications, Inc. and NextPoint Networks, Inc.'s agreement to do the foregoing by **January 23, 2008**.

Your prompt attention to this matter is appreciated.

Sincerely,

John A. Cullis

JAC:TEW/dfm

cc:    Thomas E. Williams, Esq.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NEXTPOINT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  08-CV-4593 |
| | ) | |
| v. | ) | Honorable Blanche Manning |
| | ) | |
| NEXTPOINT NETWORKS, INC., | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT BY CERTIFICATION OF ELYSE FLEISCHMAN

Under penalties as provided by law, pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

1.    I am 23 years old and I have personal knowledge of the matters attested to herein. I reside in Chicago, Illinois.

2.    I hold the position of Marketing Coordinator at Nextpoint, Inc.  I have worked there since August 1, 2007.  Part of my job at Nextpoint, Inc. is to answer the company telephone.

3.    While answering the company telephone, I have handled various calls in which the caller was attempting to reach another entity named "Nextpoint."

### Fleischman's First Four Confused Callers

4.    Prior to July 10, 2008, I received approximately four telephone calls from individuals who were confused as to whether we were another entity named "Nextpoint."

5.    The inquiries I have received since July 10, 2008, from individuals confused as to which Nextpoint entity they were calling are reflected in the telephone call log maintained by Allison Lehr (the "Log").

6.    The first four calls, which I received before that Log was created, are not reflected in the Log.

**Fleischman's Fifth Confused Caller**

7.    On July 10, 2008, I received a telephone call as reflected in the Log. The caller told me he was attempting to reach our Marketing Manager who he stated was named "Ray."

8.    I informed the caller that we had no one named "Ray" in such a position.

9.    The caller then asked whether we performed services of a type with which I was not familiar. In response, I stated that we are a litigation support company.

10.    After I said that, the caller quickly ended the call.

**Fleischman's Sixth Confused Caller**

11.    On July 23, 2008, as reflected in the Log, one of our technology professionals, Calvin Ramseyer ("Ramseyer"), informed me that he had received a call about a press release concerning the opening of a new Nextpoint office. The web address for that press release is set forth in the Log.

12.    At the time that information was given to Ramseyer, it connected the user to a Reuters article concerning Nextpoint Networks, Inc. However, the article refers to that entity simply as "Nextpoint" in both the title of the article and at various places within the text of the article. A true and accurate copy of that article is attached hereto as Exhibit 1.

13.    Ramseyer informed me that he explained to the caller that the caller had reached the wrong Nextpoint company.

2

**Correspondence From Confused Marketers**

14.     In approximately March/April 2008, we received mail meant for Nextpoint Networks, Inc. on two occasions.  Because both items appeared to be promotional materials, we threw them in the trash.

**The Confused Interviewee**

15.     On July 7, 2008, I interviewed a candidate for the position of Project Coordinator at Nextpoint, Inc.  His name is Mark Dusous ("Dusous").

16.     During the interview, Dusous explained that he attempted to prepare for our meeting by using Google to locate our company website and review the information contained on it.

17.     Dusous says that when he searched for our company he located another company also named "Nextpoint."

18.     Dusous said that the other site seemed to describe a company that did work similar to what we do.

19.     Dusous stated he was confused as to which website was the one for our company, Nextpoint, Inc.

FURTHER AFFIANT SAYETH NAUGHT.

<br>

_____

Elyse Fleischman

<br>

3

**Correspondence From Confused Marketers**

14.    In approximately March/April 2008, we received mail meant for Nextpoint Networks, Inc. on two occasions. Because both items appeared to be promotional materials, we threw them in the trash.

**The Confused Interviewee**

15.    On July 7, 2008, I interviewed a candidate for the position of Project Coordinator at Nextpoint, Inc. His name is Mark Dusous ("Dusous").

16.    During the interview, Dusous explained that he attempted to prepare for our meeting by using Google to locate our company website and review the information contained on it.

17.    Dusous says that when he searched for our company he located another company also named "Nextpoint."

18.    Dusous said that the other site seemed to describe a company that did work similar to what we do.

19.    Dusous stated he was confused as to which website was the one for our company, Nextpoint, Inc.

FURTHER AFFIANT SAYETH NAUGHT.

_Elyse Fleischman_
Elyse Fleischman

3

# EXHIBIT 1



**REUTERS**  THOMSON REUTERS

LATEST NEWS ☞ BIN LADEN'S DRIVER GETS 5 1/2 YEARS IN PRISON
Quotes, News, Pictures & Video SEARCH


**Live from Beijing**
Get the latest Olympics news, event schedules and more
Olympics Coverage


T··Mobile·
**FREE** SAMSUNG
Camera Phone
• 1.3 megapixel camera with video
• Bluetooth® connectivity
• Music player
Flip on over ❯
2-year agreement and restrictions apply

You are here:   Home > News > Article

Thu 7 Aug 2008 | 17:18 EDT

# NextPoint Appoints Zane Long as Vice President of Global Partner and Channel Sales

Mon May 5, 2008 8:01am EDT

Email |   Print |   Share |   Reprints |   Single Page | Recommend (-)

EDITOR'S CHOICE   Pictures   Video   Articles


A selection of our best photos from the past 24 hours.
View Slideshow


Secrets to Getting Rid of Cellulite Revealed


Is Your Computer Slower Than When You Bought It?


The Secret to Getting Highly Discounted Cruise Tickets

MOST POPULAR ON REUTERS

Articles   Video   Searched   Recommended

1.  **U.S. cyclists fly into China with face masks** |   Video
2.  America's never-ending prohibition: Bernd Debusmann
3.  Anthrax suspect Ivins was barred from laboratory
4.  All U.S. adults could be overweight in 40 years
5.  JetBlue offers free trip to nowhere from JFK
6.  Lost-boy Lomong to carry U.S. flag |   Video
7.  Paris Hilton strips down to reveal "hot" energy plan |   Video
8.  Freddie Mac's negative net worth raises questions
9.  Hundreds of banks will fail, Roubini tells Barron's
10. Mexican troops cross U.S. border, hold agent

Most Popular Articles RSS Feed

NextPoint Looks to Grow Its Interoperability Community as New
    Executive Expands Reseller, Distributor, and Agent Agreements
GAITHERSBURG, Md.--(Business Wire)--
NextPoint(TM), a leader in fixed-mobile connectivity (FMC)
solutions, today announced that Zane Long has been appointed Vice
President, Global Partner and Channel Sales. Long will report to
Patrick Joggerst, Senior Vice President, Global Sales and Customer
Support, and will lead NextPoint's worldwide indirect sales efforts,
working with the company's strategic partners and distributors,
including network equipment providers (NEPs).

Long's 20-year sales management career includes roles within the
telecommunications and online industries, including senior positions
at Broadwing Communications, FoodNetwork.com, and GTE Communications.
Most recently, he served as Vice President, Indirect Channels, at
Level 3, where he more than tripled revenues from indirect channels in
two years and tripled value during the same period. Long will be based
out of NextPoint's Gaithersburg, Maryland, headquarters.

"NextPoint is committed to supporting our current customers - more
than 550 service providers and enterprises - by fostering an
internetworked community. Our product suite enables community members
to pursue VoIP interconnects while they implement the next generation
network architectures and business models they require to offer
fixed-mobile convergence solutions," said Joggerst. "To better pursue
global FMC interoperability, we look to dramatically increase the
number of community members. That is why I am excited to have Zane on
board at NextPoint to manage indirect sales through our channel
partners. We believe this is the most efficient and intelligent way
for NextPoint to achieve the kind of critical mass our community
requires. Zane's demonstrated ability to develop value chains of
resellers, distributors, and agents will extend our market reach to
our community's benefit."

"I have joined NextPoint at an optimal time. The company enjoys an
established reputation within the existing customer and
interoperability partner community, and through global partners like
Alcatel-Lucent and Samsung, NextPoint is working with Tier 1 carriers
on FMC solutions," said Long. "I believe growth - and as a result,
increased internetworking opportunities - can be accelerated with the
right distribution model. In working with channel partners, my
objectives will be to broaden NextPoint's market presence to the
benefit of the community as a whole - customers, partners, and
NextPoint."

    About NextPoint

    NextPoint Networks (www.nextpointnetworks.com) delivers global,
fixed-mobile convergence (FMC) border platforms and secure
interconnectivity solutions that enable mobile and fixed-line
operators to interoperate. NextPoint's technology platform, products
and solution suites address the evolving needs of mobile and
fixed-line operators for increasing security and intelligence at the
network edge by delivering secure voice, data and multimedia over a
scalable platform. More than 550 service providers and enterprises
worldwide use NextPoint's IntelliConnect(R) system across multiple,
diverse network technologies and operating systems to manage technical
complexities, optimize business economics, and remove partnership
hurdles.

    Multimedia Support

    NextPoint IntelliConnect System

    NextPoint Solutions

    NextPoint Platforms

    NextPoint News

    Key words/tags: Fixed Mobile Convergence, FMC, interoperability,
VoIP interconnect, Network Equipment Providers, NEP, NextPoint,
reseller

Calysto Communications
Alan Gilbert, +1 (703) 255-3835
mobile: +1 (703) 624-4675
agilbert@calysto.com

Copyright Business Wire 2008

© Thomson Reuters 2008 All rights reserved

SHARE:    Del.icio.us    Digg    Mixx    My Web    Facebook    Newsvine

**GLOBAL MARKETS NEWS**

UPDATE 2-Tim Hortons posts bigger profit, confirms forecast

Canadian dollar unable to escape funk, ends lower

UPDATE 2-Sunoco: No major refinery maintenance left in 2008

UPDATE 1-Guidance Software posts surprise Q2 loss

More Global Markets News...

**PRESS RELEASE NEWS**

Porta Systems Corp. Announces New Trading Symbol and the Effectiveness of Its One-for-11.11...

1st Centennial Bancorp Announces Second Quarter Financial Results and Plans to Evaluate...

RenaissanceRe Holdings Ltd. Announces Quarterly Dividend

More Press Release News...

**ALSO ON REUTERS**






Synchronized swimming teams practice their artistry

Obama, McCain reveal pop culture favorites

English spelling "truely atrosious", says academic

**Ads by Google**  What's This?

Channel Strategy Reports
Whitepapers & Special Reports on Channel Strategy & Development.
AmazonConsulting.com/Sales-Strategy

Channel Enablement
Optimize Channel Partner Programs, Maximize Sales. Free White Paper!
www.CGSinc.com/Channel-Enablement

DIRECTV - Official Site
Packages start as low as $29.99/mo. No start up costs & Free Install.
www.directv.com

Ceo Strategy
Learn from Fellow Leaders, Vistage. Leading CEO Membership Org.
Vistage.com

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NEXTPOINT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-CV-4593 |
| | ) | |
| v. | ) | Honorable Blanche Manning |
| | ) | |
| NEXTPOINT NETWORKS, INC., | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT BY CERTIFICATION OF ALLISON LEHR

Under penalties as provided by law, pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

1.      I am 23 years old and I have personal knowledge of the matters attested to herein. I reside in Chicago, Illinois.

2.      I hold the position of Project Coordinator at Nextpoint, Inc. I have worked there since August 2007. Part of my job at Nextpoint, Inc. is to answer the company phone.

### Lehr's First Confused Caller

3.      Prior to July 10, 2008, I received a call from an individual seeking to reach another company with the name "Nextpoint."

4.      In early July 2008, the company's CEO, Rakesh Madhava ("Madhava"), asked me to create a log of interactions with individuals who contacted Nextpoint, Inc. but were attempting to reach another entity by that name.

5.    A true and correct copy of that log is attached hereto as Exhibit 1 (the "Log").  This Log was made and kept by me in the ordinary course of business by me.  The entries were made contemporaneously with the events they describe being reported to me.

**Lehr's Second Confused Caller**

6.    I took the call listed on the Log as taking place on July 11, 2008.  That call, which took place on that day, was from David Mladen ("Mladen") of an entity he identified as Excellency Investment Realty.

7.    Mladen told me he was attempting to reach the Nextpoint that does "hosting."  He said he was having a problem with his login and password.

8.    In response, I explained to him that our company, Nextpoint, Inc., hosts legal documents.  He seemed not to understand what I meant.

9.    I suggested that he might be attempting to reach Nextpoint Networks, Inc. and provided him with contact information for that entity which he indicated he was taking down.

10.    I was not contacted by Mladen again after this call.

**"Support Request E-Mails" Demonstrate Confusion**

11.    As the Log indicates, I also handled a written Support Request on July 24, 2008.

12.    A true and accurate copy of that e-mail support request, and my e-mail response thereto, are attached hereto as Exhibit 2.

13.    As the contact's e-mail indicates, the contact was confused as to which Nextpoint entity he was contacting.

14.    As the Log indicates, I also handled a written Support Request on August 1, 2008.

2

15.    A true and accurate copy of that written support request is attached hereto as Exhibit 3.

16.    After receiving that request, I contacted the sender, Todd Kechter ("Kechter"), by e-mail and asked him to call me. When we spoke by telephone, Kechter stated that he was attempting to reach "Nextpoint Networks" rather than our company, "Nextpoint."

**Solicitation E-Mails Demonstrate Confusion**

17.    As the Log indicates, on August 5, 2008, Madhava received a solicitation e-mail that shows confusion regarding the difference between Nextpoint, Inc. and Nextpoint Networks, Inc.

18.    A true and accurate copy of the e-mail received by Madhava is attached hereto as Exhibit 4.

19.    The end of that e-mail indicates that the sender's information indicates Madhava is affiliated with "Nextpoint Networks."

20.    As the Log indicates, on August 7, 2008, an employee of Nextpoint, Inc., Ben Wolf ("Wolf"), our Vice-President of Research and Development, received a solicitation e-mail that shows confusion regarding the difference between Nextpoint, Inc. and Nextpoint Networks, Inc.

21.    A true and accurate copy of the e-mail received by Wolf is attached hereto as Exhibit 5.

22.    The opening paragraph of the e-mail indicates that the sender believes Wolf is affiliated with Nextpoint Newtworks, Inc.

23.    As the Log indicates, on August 7, 2008, another employee of Nextpoint, Inc., Courtney Gray, our Vice-President of Technology, received this same e-mail solicitation (directed to her).

3

**Additional Confused Callers**

24.    There are two other individuals who also answer the telephone at Nextpoint, Inc.:

Elyse Fleischman and Bethany Sharkey.

25.    Both have received telepho ne calls, prior to July 10, 2008, from individuals

attempting to reach a Nextpoint entity other than our employer, Nextpoint, Inc.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Allison Lehr

# EXHIBIT 1

**Phone Calls**

| Date | Name | Company | Contact info | Reason called | How did they get our info? | Confirmed Nextpoint Networks? | Who fielded? |
|------|------|---------|--------------|---------------|----------------------------|-------------------------------|--------------|
| 7/10/2008 | | | | Someone called to speak to Ray, Marketing Manager | | When asked, caller agreed that he meant to contact Nextpoint Networks | Elyse Fleishman |
| 7/11/2008 | David Mladen | Excellency Investment Realty | 914-725-0920 | Needed log-in and password. Trying to contact Nextpoint who does "hosting." He seemed confused when I told him that I thought he might have the wrong company. I suggested that he might be trying to contact Nextpoint Networks and gave him their support number from their website. | | Not confirmed | Alli Lehr |
| 7/23/2008 | | | | About press release new office in Gathersburg, Maryland; http://www.reuters.com/article/pressRelease/idUS81746+05-May-2008+BW20080505 | | Press release referred to is for Nextpoint Networks | Calvin Ramseyer |
| 7/26/2008 | No Report | No Report | No Report | Email not working | Googled "nextpoint" | Not confirmed | Sarah Donovan |

**Support Requests**

| Date | Name | Company | Contact info | Reason Contacted | How did they get our info? | Confirmed Nextpoint Networks? | Who fielded? |
|------|------|---------|--------------|------------------|----------------------------|-------------------------------|--------------|

| Date | Name | Company | Contact info | Reason Contacted | How did they get our info? | Confirmed Nextpoint Networks? | Who fielded? |
|---|---|---|---|---|---|---|---|
| 2/28/2008 | Sarah Rollinger | Tiscareno Associates | SarahR@tiscareno.net | Issues with FTP site; request directed to "Mark" | Unsure; emailed support@nextpoint.com | Not confirmed | Email support (Ben Wolf received) |
| 4/9/2008 | Sarah Rollinger | Tiscareno Associates | SarahR@tiscareno.net | Computer automatically restarting after updates (see request "ticket"; request directed to "Mark" | Unsure; emailed support@nextpoint.com or sent request from support site | Not confirmed | Email or online support (Alli Lehr responded?) |
| 7/24/2008 | Aaron Swain | Tiscareno Associates | 206.325.3356, ext. #202 | ProLog project- trouble downloading from doc mgmt sit (see request "ticket"). Confirmed on 7/29/08 via phone that he was trying to reach a different Nextpoint. | According to Aaron, someone from his office entered the wrong email into their contact list. He does not know who this might have been. | Not confirmed | Email or online support (Alli Lehr responded) |
| 8/1/2008 | Todd Kechter | Cox Communications | 404-269-0484 | Problems with "eth2 and eth3 interfaces" | He emailed "support@nextpoint.com" instead of their address | Yes | Alli- I spoke with him via phone after receiving support request |

**Solicitation Emails**

| Date | Name | Company | Contact info | Reason Contacted | How did they get our info? | Confirmed Nextpoint Networks? | Who fielded? |
|---|---|---|---|---|---|---|---|
| 8/5/2008 | Taylor Evans | The CMO Summit | taylor@thecmosummit.net | Solicitation to become part of CMO Summit | Unknown | Yes- mentions Nextpoint Networks in the email | Rakesh Madhava received |
| 8/7/2008 | Alexis Richardson | Cvent (Account Executive) | seminars@cvent.com | Invitation to attend luncheon event | Unknown | Yes- mentions Nextpoint Networks in the email | Ben Wolf and Courtney Gray received |

# EXHIBIT 2

**From:** Allison Lehr <alehr@nextpoint.com>
**Date:** Thu, 24 Jul 2008 15:20:46 -0500
**To:** Nextpoint Support <support@trialmanager.com>
**Conversation:** Ticket #66. New Support Request: 66
**Subject:** Re: Ticket #66. New Support Request: 66

Hi Aaron,

I think you may be trying to contact a different Nextpoint- Nextpoint Networks. Our Nextpoint is a legal services and technology company.  Looks like you can contact their support at the numbers below.

Contact Support
+1-240-686-3983
+1-888-574-3029

Regards,
Alli

**Alli Lehr**
*Project Coordinator*
773.929.4000 ext 140

nextpoint.com

On 7/24/08 2:16 PM, "Nextpoint Support" <support@trialmanager.com> wrote:

## In replies all text above this line is added to the ticket ##

**Ticket #66. New Support Request: 66 <http://support.trialmanager.com/tickets/66>**

You have received a new request for support. See details below. User: Aaron Swain
Description" Problems downloading PDFs: Mark,  I'm unable to download PDF files from a document management site for one
of our projects (ProLog, if you are familiar).  I've had this problem
with other sites, but have been able to route around it by "saving
target as"-I'm not given that option for this site.   I don't know if you'll be visiting the office today, or next week, but
it might be simpler if I show you the site, and you can assess what the

problem might be.  Thanks!  Aaron Swain Tiscareno Associates 500 Union Street, Suite 420 Seattle, WA 98101 206.325.3356,  ext. #202 </tickets/202> www.tiscareno.net <http://www.tiscareno.net> Click below to route the request to the appropriate group:

support.trialmanager.com/tickets/66

**This email is a service from Nextpoint Support**

------ End of Forwarded Message

# EXHIBIT 3

**From:** Nextpoint Support <support@trialmanager.com>
**Date:** Fri, 1 Aug 2008 09:50:57 -0500
**To:** Allison Lehr <alehr@nextpoint.com>
**Subject:** Ticket #67. 67 assigned to Account/General Customer Support

## In replies all text above this line is added to the ticket ##

Ticket #67. 67 assigned to Account/General Customer Support <http://support.trialmanager.com/tickets/67>

A ticket has been assigned to Account/General Customer Support. See ticket request below. User: Todd Kechter
Description:

**Alli Lehr said, Aug 01 at 09:50 AM:**Hi Todd, Would you please give me a call at 773-929-4000 ex 140? Thanks, Alli On 8/1/08 9:38 AM, "Nextpoint Support" <support@trialmanager.com> wrote:

**Todd Kechter said, Aug 01 at 09:38 AM:**FP 57116: This ticket should not be closed. We don't have a root cause for why the eth2 and eth3 interfaces suddenly

disappeared. You can respond to this ticket via email. When the request has been solved, please click the link below and mark "Solved." support.trialmanager.com/tickets/67

**This email is a service from Nextpoint Support**

------ End of Forwarded Message

# EXHIBIT 4

**From:** Rakesh Madhava <rmadhava@nextpoint.com>
**Date:** Thu, 7 Aug 2008 18:40:22 -0500
**To:** Allison Lehr <alehr@nextpoint.com>
**Subject:** FW: Rakesh, feedback requested.

 FYI I also got it

------ Forwarded Message
**From:** Taylor Evans <taylor@thecmosummit.net>
**Date:** Tue, 5 Aug 2008 08:58:03 -0500
**To:** Rakesh Madhava <rmadhava@nextpoint.com>
**Subject:** Rakesh, feedback requested.

Hi Rakesh, I wanted to check in and see if the timing was now better for
you to become a part of The CMO Summit.  I recently updated the list of
executives you would be grouped with and added the upcoming meeting
schedule at www.thecmosummit.net if you could take a quick look and get
back to me. We would really like to have you or an appropriate executive
from the marketing management side involved.

Some of the more recognizable executives in these available groups
include:
- Endicia, Steve Rifai, VP of Marketing
- Envision EMI, Meeghan De Cagna, CMO
- Interpower Corporation, Ralph Bright, VP Marketing
- Malvern Instruments, Randy Byrne, VP Marketing
- SMP Media/Channel Group, Kate Spellman, SVP Strategic Mgmt. & Business
Development
- Sony Creative Software, Dave Chaimson, VP Marketing
- Sybase, Inc., Raj Nathan, SVP & Chief Marketing Officer
- VoiceSignal, Mira Gneser, VP of Marketing

As background, the CMO Summit comprises the top executives and
visionaries in marketing management. We meet monthly by teleconference to
exchange what is working, what is not, strategies and ideas. Here are a

8/8/2008

couple of recent and upcoming teleconference meeting topics:
- Garmin International, Jessica Myers, Senior Media Relations Specialist,
"Blogging: How it Fits Into Your Marketing Mix"
- New York Life, Ken Hittel, VP Marketing, "'Large, Conservative and
Dull' Does Web 2.0"
- Alcatel-Lucent, Christina James, Senior Marketing Manager, "Measuring
Performance on Marketing Programs: More than ROI"
- CB Richard Ellis, Jena Hollensteiner, Vice President Marketing,
Americas, "Marketing Innovation and Operational Efficiencies (B to B)"

Can you take a look and get back to me? Thanks Rakesh and I hope you can
join us.

Best regards,

Taylor Evans
The CMO Summit
1200 Abernathy Road, 17th Fl.
Atlanta, GA 30328
404-592-9904 Ext 804
Mail back to decline further.
www.TheCMOSummit.net

For my records in case any follow-up is needed, I show your contact
information as: Rakesh Madhava, NextPoint Networks,
rmadhava@nextpoint.com, , , ,   773-929-4000

------ End of Forwarded Message

------ End of Forwarded Message

# EXHIBIT 5

**From:** Ben Wolf <<u>bwolf@nextpoint.com</u>>
**Date:** Thu, 7 Aug 2008 11:39:13 -0500
**To:** Allison Lehr <<u>alehr@nextpoint.com</u>>
**Subject:** FW: Reminder - Best Practices Lunch Seminar

More emails for nextpoint networks.


------ Forwarded Message
**From:** Alexis Richardson <<u>seminars@cvent.com</u>>
**Reply-To:** <<u>seminars@cvent.com</u>>
**Date:** Thu, 07 Aug 2008 12:18:02 -0400
**To:** Ben Wolf <<u>bwolf@nextpoint.com</u>>
**Subject:** Reminder - Best Practices Lunch Seminar

Dear Ben,

I recently invited you to a complimentary luncheon seminar to learn best practices and
industry leading tools for NextPoint Networks , Inc.'s events, surveys, and marketing
campaigns.  The luncheon is hosted by Cvent, the leading provider of online software tools
for event registration and online surveys.

EVENTS --> Increase attendance and reduce expense:

*  Conduct online registration, attendee management, and corporate event management
*  Collect registration fees for external meetings, events and conferences
*  Employ Strategic Meetings Management to plan, manage, and measure meetings and
events
*  Gather business intelligence and track meeting spend with standard or custom reports
*  Integrate with hotel and travel solutions such as Passkey, Cliqbook, GetThere, etc.
*  Match your company branding in all registration pages, email invitations, and event
calendars
*  Use the Cvent Supplier Network <<u>http://guest.cvent.com/rfp/default.aspx?</u>
<u>WT.mc_id=SEMINAR_521</u>>  for meeting site selection and to identify meeting service

8/8/2008

providers

SURVEYS --> Collect data effortlessly via the web:

* Increase survey response rates
* Decrease cost of gathering and analyzing feedback
* Gather data from customers for executive review
* Generate qualified sales lead
* Get the inside track on industry trends
* Get feedback from employees on how to reduce costs
* Identify consensus on controversial topics

Take this opportunity to discover what we have learned
from over 100,000 successful campaigns!

All registrants will receive access to a library of white papers on best practices for
Event Management and Online Surveys.

Each session occurs from 12:00-1:30 PM Central Time at the following dates and venues:

Monday, August 11th
The Metropolitan Club - Chicago
Click here <http://guest.cvent.com/i.aspx?9C,P1,4F0401E4-0BEC-4BE8-AECE-
18A55E4D8224,77NXDARLZDS>
- For that important business or social event, The Metropolitan Club is the perfect place to
entertain. Our experienced catering staff will assist you with every detail. Our 19 private
dining rooms are perfectly suited to accommodate from two to 800 for your business or
social event, whether it be a casual 'theme" party or an elegant "black tie" affair.

Tuesday, August 12th
McCormick  Schmick's Seafood Restaurant - Chicago
Click here <http://guest.cvent.com/i.aspx?9C,P1,4F0401E4-0BEC-4BE8-AECE-
18A55E4D8224,7DNGC227XSP>
- Located in Chicago's famous "Gold Coast", McCormick  Schmick's prepares fresh seafood
in a traditional manner with a contemporary twist, as well as many other original favorites
such as sirloin steak, and McCormick and Schmick's classics.

Wednesday, August 13th
Va Pensiero Restaurant - Evanston
Click here <http://guest.cvent.com/i.aspx?9C,P1,4F0401E4-0BEC-4BE8-AECE-
18A55E4D8224,5RNH2R6SDEU>
- Tucked within the historic Margarita Inn, Va Pensiero features the finest cuisine from the
various regions of Italy. Our menu features homemade pastas and breads, seafood, veal
and lamb dishes, the freshest vegetables and most exquisite desserts. The classical
architecture creates an intimate and romantic atmosphere for any special occasion.

Thursday, August 14th
Wildfire - Schaumburg
Click here <http://guest.cvent.com/i.aspx?9C,P1,4F0401E4-0BEC-4BE8-AECE-
18A55E4D8224,6RNYZ8XQMMY>
- Plan your next party at Wildfire Schaumburg. Our private and semi-private dining

spaces offer a variety of options for any social or corporate event.  So order a signature martini or one of our many wines by the glass, then sit back and enjoy the quintessential 1940s supper club experience of Wildfire.

NO - I am unavailable at this time <http://guest.cvent.com/i.aspx?3Z,P1,4F0401E4-0BEC-4BE8-AECE-18A55E4D8224>

You can also sign up for a webinar on our website by viewing our calendar:
Event Product Webinar Schedule <http://www.cvent.com/products/event-webinars.shtml>
Survey Product Webinar Schedule <http://www.cvent.com/products/survey-webinars.shtml>

Sincerely,
Alexis Richardson
Account Executive, Cvent
seminars@cvent.com

Search 75,000 Event Venues on the Cvent Supplier Network
<http://guest.cvent.com/rfp/default.aspx?WT.mc_id=SEMINAR_521>
Introducing a powerful new tool for meeting planners.  Search our database of 75,000+ event venues and service providers to find the best possible price and availability information on event space and meeting services.  Use the Cvent Supplier Network <http://guest.cvent.com/rfp/default.aspx?WT.mc_id=SEMINAR_521>  for your upcoming meeting planning needs – there is no charge for meeting planners to use this service.

* * * * * * * * * * * * * * * * * * * * * *
To be excluded from future emails from Cvent:
Click here <http://guest.cvent.com/i.aspx?8D,P1,4F0401E4-0BEC-4BE8-AECE-18A55E4D8224>
* * * * * * * * * * * * * * * * * * * * * *
Cvent, Inc. | 8180 Greensboro Drive, Suite 450 | McLean, VA 22102 |
In compliance with Federal regulations, we hereby disclose that this email is commercial.

------ End of Forwarded Message


------ End of Forwarded Message